# NO. 12-17-00306-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *IN THE INTEREST OF* | § | *APPEAL FROM THE 173RD* |
| *B.W. AND C. W.,* | § | *JUDICIAL DISTRICT COURT* |
| *CHILDREN* | § | *HENDERSON COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

J.W. appeals the termination of her parental rights. In five issues, she challenges the sufficiency of the evidence to support the trial court's termination order. We affirm.

## BACKGROUND

J.W. is the mother and J.P., III is the father of twins, B.W. and C.W.[1] On August 23, 2016, the Department of Family and Protective Services (the Department) filed an original petition for protection of B.W. and C.W., for conservatorship, and for termination of J.W.'s and J.P., III's parental rights. The Department was appointed temporary managing conservator of the children, and J.W. was appointed temporary possessory conservator with limited rights and duties.

At the conclusion of the trial on the merits, the trial court found, by clear and convincing evidence, that J.W. had engaged in one or more of the acts or omissions necessary to support termination of her parental rights under subsections (D), (E), and (O) of Texas Family Code

---

[1] The trial court found, by clear and convincing evidence, that the father of the children, J.P. III, after having waived service of process or being served with citation, did not respond by timely filing an admission of paternity or by filing a counterclaim for paternity or for voluntary paternity to be adjudicated under Chapter 160 of the Texas Family Code before the final hearing in this suit. The trial court found that J.P., III is, and was hereby adjudicated to be the father of B.W. and C.W. The trial court also found that termination of the parent-child relationship between J.P., III, B.W. and C.W. was in the children's best interest. Therefore, the trial court ordered that the parent-child relationship, if any exists or could exist, between J.P., III, B.W., and C.W. be terminated. The father is not a party to this appeal.

Section 161.001(b)(1). Further, the trial court found that J.W. had a mental or emotional illness or a mental deficiency that rendered her unable to provide for the physical, emotional, and mental needs of the children under Section 161.003 of the Texas Family Code. The trial court also found that termination of the parent-child relationship between J.W., B.W., and C.W. was in the children's best interest. Based on these findings, the trial court ordered that the parent-child relationship between J.W., B.W., and C.W. be terminated. This appeal followed.

## TERMINATION OF PARENTAL RIGHTS

Involuntary termination of parental rights embodies fundamental constitutional rights. *Vela v. Marywood*, 17 S.W.3d 750, 759 (Tex. App.–Austin 2000), *pet. denied per curiam*, 53 S.W.3d 684 (Tex. 2001); *In re J.J.*, 911 S.W.2d 437, 439 (Tex. App.–Texarkana 1995, writ denied). Because a termination action "permanently sunders" the bonds between a parent and child, the proceedings must be strictly scrutinized. *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976); *In re Shaw*, 966 S.W.2d 174, 179 (Tex. App.–El Paso 1998, no pet.).

Section 161.001 of the family code permits a court to order termination of parental rights if two elements are established. TEX. FAM. CODE ANN. § 161.001 (West Supp. 2017); *In re J.M.T.*, 39 S.W.3d 234, 237 (Tex. App.–Waco 1999, no pet.). First, the parent must have engaged in any one of the acts or omissions itemized in the second subsection of the statute. TEX. FAM. CODE ANN. § 161.001(b)(1) (West Supp. 2017); *Green v. Tex. Dep't of Protective & Regulatory Servs.*, 25 S.W.3d 213, 219 (Tex. App.–El Paso 2000, no pet.); *In re J.M.T.*, 39 S.W.3d at 237. Second, termination must be in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(b)(2) (West Supp. 2017); *In re J.M.T.*, 39 S.W.3d at 237. Both elements must be established by clear and convincing evidence, and proof of one element does not alleviate the petitioner's burden of proving the other. TEX. FAM. CODE ANN. § 161.001; *Wiley*, 543 S.W.2d at 351; *In re J.M.T.*, 39 S.W.3d at 237.

The clear and convincing standard for termination of parental rights is both constitutionally and statutorily mandated. TEX. FAM. CODE ANN. § 161.001; *In re J.J.*, 911 S.W.2d at 439. Clear and convincing evidence means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2014). The burden of proof is upon the party seeking the deprivation of parental rights. *In re J.M.T.*, 39 S.W.3d at 240.

STANDARD OF REVIEW

When confronted with both a legal and factual sufficiency challenge, an appellate court must first review the legal sufficiency of the evidence. *Glover v. Tex. Gen. Indem. Co.*, 619 S.W.2d 400, 401 (Tex. 1981); *In re M.D.S.*, 1 S.W.3d 190, 197 (Tex. App.–Amarillo 1999, no pet.). In conducting a legal sufficiency review, we must look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its findings were true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We must assume that the fact finder settled disputed facts in favor of its finding if a reasonable fact finder could do so and disregard all evidence that a reasonable fact finder could have disbelieved or found incredible. *Id*.

The appropriate standard for reviewing a factual sufficiency challenge to the termination findings is whether the evidence is such that a fact finder could reasonably form a firm belief or conviction about the truth of the petitioner's allegations. *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). In determining whether the fact finder has met this standard, an appellate court considers all the evidence in the record, both that in support of and contrary to the trial court's findings. *Id*. at 27-29. Further, an appellate court should consider whether disputed evidence is such that a reasonable fact finder could not have reconciled that disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. The trier of fact is the exclusive judge of the credibility of the witnesses and the weight to be given their testimony. *Nordstrom v. Nordstrom*, 965 S.W.2d 575, 580 (Tex. App.–Houston [1st Dist.] 1997, pet. denied).

## TERMINATION UNDER SECTION 161.001(b)(1)(E)

In her third issue, J.W. argues the evidence is legally and factually insufficient to terminate her parental rights pursuant to subsection (E) of Texas Family Code Section 161.001(b)(1).

**Applicable Law**

The court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has engaged in conduct, or knowingly placed the child with persons who engaged in conduct, that endangers the physical or emotional well being of the child. TEX. FAM. CODE ANN. § 161.001(b)(1)(E) (West Supp. 2017). Scienter is not required for an appellant's own acts under Section 161.001(b)(1)(E), although it is required when a parent

places her child with others who engage in endangering acts. *In re U.P.*, 105 S.W.3d 222, 236 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). Finally, the need for permanence is a paramount consideration for the child's present and future physical and emotional needs. *In re N.K.*, 99 S.W.3d 295, 301 n.9 (Tex. App.—Texarkana 2003, no pet.); *In re M.D.S.*, 1 S.W.3d at 200.

"Endanger" means to expose to loss or injury or to jeopardize. *Tex. Dep't of Human Svcs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re D.M.*, 58 S.W.3d 801, 811 (Tex. App.—Fort Worth 2001, no pet.). It is not necessary that the conduct be directed at the child or that the child actually suffers injury. *Boyd*, 727 S.W.2d at 533; *In re J.J.*, 911 S.W.2d at 440. Subsection (E) requires us to look at the parent's conduct alone, including actions, omissions, or the parent's failure to act. *In re D.J.*, 100 S.W.3d 658, 662 (Tex. App.—Dallas 2003, pet. denied); *In re D.M.*, 58 S.W.3d at 811. Termination under subsection (E) must be based on more than a single act or omission. *In re D.M.*, 58 S.W.3d at 812; *In re D.T.*, 34 S.W.3d 625, 634 (Tex. App.—Fort Worth 2000, pet. denied). A voluntary, deliberate, and conscious "course of conduct" by the parent that endangers the child's physical and emotional well being is required. *In re D.M.*, 58 S.W.3d at 812; *In re D.T.*, 34 S.W.3d at 634.

As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well being of a child. *In re M.R.J.M.*, 280 S.W.3d 494, 503 (Tex. App.—Fort Worth 2009, no pet.); *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied). Mental illness alone is not grounds for terminating the parent-child relationship. *In re S.R.*, 452 S.W.3d 351, 363 (Tex. App.—Houston [14th Dist.] 2014, pet. denied); *see also Maxwell v. Tex. Dep't of Family & Protective Servs.*, No. 03-11-00242-CV, 2012 WL 987787, at *9 (Tex. App.—Austin Mar. 23, 2012, no pet.) (mem. op.). Untreated mental illness can expose a child to endangerment, however, and is a factor the court may consider. *See In re S.R.*, 452 S.W.3d at 363; *Maxwell*, 2012 WL 987787, at *9; *In re L.L.F.*, No. 02-11-00485-CV, 2012 WL 2923291, at *15 (Tex. App.—Fort Worth July 19, 2012, no pet.) (mem. op.) (considering a parent's failure to take medication to treat mental health issues as a factor in creating an environment that endangers the child's emotional or physical well-being); *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.) (considering a parent's mental health and noncompliance with her medication schedule as factors in endangering the child). In other words, a parent's mental state may be considered in determining

4

whether a child is endangered if that mental state allows the parent to engage in conduct that jeopardizes the physical or emotional well-being of the child. *In re R.W.*, 129 S.W.3d at 739; *In re J.I.T.P.*, 99 S.W.3d at 845; *In re C.D.*, 664 S.W.2d 851, 853 (Tex. App.—Fort Worth 1984, no writ).

If a parent abuses or neglects another child, that conduct can be used to support a finding of endangerment even against a child who was not yet born at the time of the conduct. *In re C.J.F.*, 134 S.W.3d 343, 351 (Tex. App.—Amarillo 2003, pet. denied). Endangering conduct is not limited to actions directed towards the child. *Boyd*, 727 S.W.2d at 533. It necessarily follows that the endangering conduct may include the parent's actions before the child's birth and while the parent had custody of older children. *See id.* (stating that although endanger means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the parent's conduct be directed at the child or that the child actually suffers injury); *see also In re M.N.G.*, 147 S.W.3d 521, 536 (Tex. App.—Fort Worth 2004, pet. denied) (holding that courts may look to parental conduct both before and after child's birth to determine whether termination is appropriate). Further, the conduct may occur before the child's birth and both before and after the child has been removed by the Department. *Walker v. Tex. Dep't of Family & Protective Srvs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

## Analysis

At trial, the evidence shows that this case began when J.W. had the twins at Charlton Methodist Hospital in Dallas, Texas. Chasiti Hill, an investigator with the Department, testified that she was asked to meet with J.W. at the hospital as a courtesy worker from Dallas County, Texas. She reviewed J.W.'s Department history, met J.W. and the children at the hospital, spoke with hospital personnel and caseworkers, and made an assessment. Hill said that she told her supervisor and the investigator from the originating county that J.W. did not appear to be coherent and did not have the necessities to take the children home at that time. Ryelea Etheredge, a Department conservatorship worker and the children's caseworker, stated that the children were removed from J.W.'s custody because J.W. did not receive prenatal care, did not know she was having twins, and did not have any provisions for the children, such as car seats or cribs.

5

***Department History.*** J.W. had a long history with the Department. She reported that she relinquished her parental rights to her three older children. She stated that her older two children were removed from her custody when they were two years old and one year old. She believed that she was involved in family-based safety services, but that "[n]obody gave [her] anything else to do on that case." According to Etheredge, J.W. did not complete her family-based safety services.

The Department removed J.W.'s third child from her custody at the hospital when the baby was about two days old. She stated that she was offered services in Tyler, but had no transportation. She said that part of her service plan included mental health services and completion of an evaluation at the Andrews Center. J.W. failed to obtain the evaluation because the telephone number for the Andrews Center was "all the way in Tyler." Etheredge stated that J.W. did not complete her service plan regarding her third child. The same couple adopted J.W.'s three older children.

***Mental Health.*** J.W.'s ongoing mental health issues were a significant concern in this case, particularly her schizophrenia diagnosis, and her apparent refusal to treat it. As part of her service plan, J.W. was ordered to contact the Andrews Center to obtain a psychiatric assessment. Claudia Michelle Walker, a licensed professional counselor and therapist at the Andrews Center, testified that she diagnosed J.W. with schizophrenia undifferentiated and borderline intellectual functioning. She said that "undifferentiated" meant that the person suffered from the base symptoms of schizophrenia including delusions and psychosis. J.W. told Walker that she heard voices from the "unknown," although she said that she knew who they were, where they were coming from, and had heard them "all of her life." Walker stated that J.W. did not appear to be concerned about hearing voices.

Bonny McBride, a licensed clinical social worker, testified that J.W. was referred by the Department for counseling. She stated that J.W. met with her for four sessions, and she referred J.W. to the Andrews Center for a mental health diagnosis. McBride was concerned with J.W.'s mental status because J.W. told her that she talked to deceased relatives and saw people that others did not see. She stated that it was "evident" that J.W. had "major [mental] problems." McBride provisionally diagnosed J.W. with neglect of a child because she did not have prenatal care while pregnant with the twins, and unspecified personality disorder because she reported hearing voices and talking to deceased people. McBride believed that J.W. understood that she

6

had been diagnosed with schizophrenia and that she was supposed to take medications or follow-up regarding possible medications. McBride testified that J.W. appeared coherent at the initial assessment. Etheredge stated that J.W.'s mental health was a concern in this case, as it was for her third child's case.

J.W. stated that she did not believe she was a mental threat to the children or that she was unstable. She also stated that she did not want to take medications for her mental health problems if it caused her harm. If she was prescribed medication for schizophrenia, she would have to "check it out" before she took it. J.W. believed that the Department was concerned about her mental health because she did not attend public school. According to J.W., she hears voices occasionally, specifically from a deceased cousin who she regarded as her child. She described the cousin as her strength, her shelter, and one who helped her read, write, and do arithmetic better while she was alive. J.W. did not recall mentioning to the Department that while she was pregnant with her third child, she believed that child was a snake living inside of her. However, she did testify that she "felt" that child, her third, from "day one," but not "totally talking." She also did not recall telling the Department that her name was "Jade."

***Ability to Care for the Children.*** J.W. did not show that she had the ability to adequately care for the children. Hill stated that when she met J.W. at the hospital, J.W. did not seem to understand why she, Hill, was there. Nor did J.W. appear "very coherent." She stated that J.W. did not appear willing or able to answer all of her questions, including the names of the children, when they were last fed, or her own history.

According to Hill, she did not observe J.W. feed or change the children even though she was in the hospital room for several hours. J.W.'s clothing for the children appeared to be used, dirty, and stained. Hill stated that J.W. had no prenatal care and did not know that she was pregnant with twins. Further, J.W. did not indicate that she was ready to take the children home because she did not have car seats for them nor had she made sleeping arrangements for them. Although J.W. gave Hill the name of two individuals as possible placement or alternate caregivers for the children, neither was appropriate because they had significant medical history that would not allow them to take care of newborn children.

McBride testified that J.W. told her that the older couple she lived with would provide transportation and a place to live in exchange for her helping them with the house. However, she was concerned that J.W. did not realize the importance of bonding and attaching with the

children, or providing for their medical needs. According to McBride, J.W. seemed to be very interested in regaining the relationship with the father through the children, but talked more about the children in their last session.

McBride also testified that J.W. could not read or write, and noted that a psychological evaluation indicated that she had a second grade reading level. According to McBride, J.W. was unable to complete the intake form. She did not believe that J.W. could read a prescription and questioned her ability to give medications to a child. According to J.W., she could read and write, and was improving those skills. She admitted finishing only the second grade in school. However, she stated that she would be able to understand all the documentation and chemistry regarding any prescription for her mental health issues. McBride believed that J.W. would need the supervision of a "full-functioning adult" to provide for the physical, emotional, and mental needs of any child. Etheredge was concerned with J.W.'s ability to understand instructions from a physician or to understand the children's medications.

Further, Etheredge testified that J.W. had difficulty caring for the children during her visitations and was not receptive to Etheredge's guidance. She had to show J.W. how to mix the children's bottle properly on at least five or six occasions. J.W. would insist that she was mixing them properly, and did not understand the difference in the amount of formula in a properly mixed bottle. Etheredge stated that J.W. did not always burp the children and changed them without wiping them. Moreover, she said, J.W. had trouble propping the children up or propping them up too much, rarely allowed them to play with toys, and brought age inappropriate food. Etheredge testified that she had to interrupt visitations between J.W. and the children about sixty percent of the time because J.W. was not caring for the children appropriately or was demonstrating inappropriate parenting skills.

Rebecca Stahl, the CASA volunteer, agreed with Etheredge's concerns regarding visitations between J.W. and the children. During the last visitation, J.W. was informed that the children were no longer on formula, but regular milk, and had sippy cups. However, J.W. prepared to give them formula and bottles. Etheredge had to intervene. According to Stahl, J.W. appeared to become "very flustered," stopped, and became frustrated. Stahl stated that J.W. also appeared to become very tense towards the end of each two hour visitation.

Additionally, B.W. and C.W. have developmental delays that J.W. does not appear to acknowledge. J.W. stated that C.W. crawled at her last visit. However, she described his

crawling as "combat" or "military" crawling, i.e., dragging, and not using, his legs. She was not concerned because she had crawled that way as a child. She stated that the children were "perfect," but might need some extra help. According to Etheredge, both children have specialized needs and developmental and growth delays. C.W. continues to receive weekly occupational therapy, and B.W. tends to favor one side and has a tracking issue with her vision. Etheredge also described C.W.'s crawling as not using his legs at all, and that his medical providers were attempting to determine the connection between his crawling and his developmental delays. Both children may need more therapy. Stahl did not believe that J.W. would be able to address the children's delays.

J.W. appeared to be reluctant to take the children to medical providers on a regular basis. She stated that she did not like to "deal" with doctors. She said that she would take the children to a doctor if they needed help, and to the dentist if they had a problem. According to J.W., she would take the children to get their immunizations. She also stated that she would take them to school, but not day care.

***Home, Provisions, and Employment.*** J.W.'s home, provisions for the children, and employment appear to be inappropriate or inadequate. According to Etheredge, J.W.'s home was a single-wide trailer with a bedroom on each end of the trailer. The trailer was typically untidy, had an odor, had a hole in the kitchen floor, and three parts of the floor were rotting enough that it gave way when walked on. The odor consisted of body odor and pet urine. She believed that there was a cat and a dog in the home. Etheredge had been in the home five times and most recently, three weeks before trial. The odor and untidiness were consistent. Etheredge stated that there was a piece of plywood over the hole in the floor, but it was unsecured and would not be difficult for children to move. The "soft" areas of the floor made Etheredge fear that she would fall through. She talked to J.W. about the condition of the home and J.W. responded that she was "working on it." J.W. stated that there was only "one" hole in the floor and that the home was in the best repair "as it [could] be."

Etheredge also testified that she saw roaches in the food pantry, and uncovered food and mold in the refrigerator. Recently, she said, it appeared that J.W. tried to clean the refrigerator, but there was still evidence of mold. However, at that time, J.W. also stated that there was no food in the pantry and did not open it. J.W. denied that there were roaches in the home. She testified that she had two cribs, a double stroller, clothes, a box of diapers, food, and a few

educational toys. She admitted that she did not have car seats for the children and at trial, she stated that she did not believe she could obtain them.

According to the evidence at trial, J.W.'s home was owned by a male friend, and J.W. lived in the home with the friend, the friend's fiancée, and J.W.'s fiancée. J.W. did not pay rent, but instead, helped with gas money and helped her friend travel to his doctor's appointments. She also looked after the friend's fiancée. J.W. testified that she was a home health worker and had two clients, including her friend's fiancée. She stated that she earned approximately $500.00 every two weeks and received food stamps. J.W.'s fiancée also earned approximately $500.00 every two weeks and she believed that, together, they could provide financially for the children.

Additionally, J.W. testified regarding her support system for taking care of the children. She stated that her roommates, the owner of the home and his fiancée, could take care of the children while she was at work. However, the owner of the home stated that he was disabled because of back problems, and his fiancée was in a wheelchair with numerous health problems. Etheredge did not believe that J.W.'s fiancée, the owner of the home, or the owner's fiancée had ever met the children. She believed that J.W.'s support system was adequate to take care of her, but not the children.

***Service Plan.*** J.W. did not complete her service plan. Etheredge testified that J.W. was ordered to participate in individual counseling and follow all of the recommendations until successfully discharged. According to Etheredge, McBride did not discharge J.W. J.W. completed a child caregiver resource form, did not miss any scheduled appointments except for one appointment with the Andrews Center, and participated in a psychological assessment. Etheredge testified that the psychological assessment recommendations included completing individual counseling focusing on reality testing, basic parenting skills, and personality issues, parenting classes regarding parental domestic violence and basic needs for children, obtaining a child care mentor skilled in caring for infants, and monitoring her hygiene. J.W. maintained weekly contact with Etheredge, attended or participated by telephone in all appointments, hearings, or meetings regarding the children, and completed a health, social, education, and genetic history.

***Recommendations.*** McBride did not believe that J.W. had the mental or emotional ability to provide for the physical, emotional, or mental needs of any child without the supervision of a "full-functioning adult." Etheredge did not believe that J.W. would be able to

meet the children's medical needs, and that it was in the children's best interest for J.W.'s parental rights to be terminated. Nor did she believe that J.W. had been willing or able to effect positive environmental or personal changes that demonstrated an ability to care for the children. She did not believe that J.W. could support the children financially, mentally, physically, or emotionally. Stahl likewise believed that J.W.'s parental rights needed to be terminated. J.W. testified that she wanted to take the children home and was ready for them. She believed that it would be best for the children if the Department's case was dismissed.

**Conclusion**

From this evidence, a reasonable fact finder could have determined that J.W. voluntarily relinquished her older three children, failed to complete her service plan, was unwilling or unable to seek treatment for her mental health issues, and was unconcerned about hearing voices from deceased relatives. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E). The fact finder could have also formed a firm belief or conviction that J.W. was unable to adequately care for the children because she had inadequate and inappropriate housing, did not have adequate provisions for the children including car seats, was unable to acknowledge that the children had significant developmental and growth delays, appeared reluctant to seek medical help for the children, had difficulty caring for the children even under supervision, and lacked a support system to help care for her children. *See id.* Therefore, we hold that the evidence, viewed in the light most favorable to the finding, was sufficiently clear and convincing that a reasonable trier of fact could have formed a firm belief or conviction that J.W. engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the physical or emotional well being of the children. *See In re J.F.C.*, 96 S.W.3d at 266.

Although J.W. argued that she did not physically or emotionally harm the children while visiting them under supervision, this evidence is not so significant that a reasonable trier of fact could not have reconciled the evidence in favor of its finding and formed a firm belief or conviction that J.W. engaged in conduct, or knowingly placed the children with persons who engaged in conduct that endangered the physical or emotional well being of the children. *See In re C.H.*, 89 S.W.3d at 25.

11

Therefore, we hold that the evidence is legally and factually sufficient to support termination of J.W.'s parental rights under subsection (E) of Texas Family Code Section 161.001(b). Accordingly, we overrule J.W.'s third issue.[2]

## BEST INTEREST OF THE CHILDREN

In her fifth issue, J.W. contends the evidence is insufficient to support a finding that termination of her parental rights is in the children's best interest. Texas Rule of Appellate Procedure 38.1 sets forth what must be included in an appellant's brief. *See* TEX. R. APP. P. 38.1. Rule 38.1(i) requires that an appellant's brief "contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record." TEX. R. APP. P. 38.1 (i). The appellate court has no duty to brief issues for an appellant. *Huey v. Huey*, 200 S.W.3d 851, 854 (Tex. App.–Dallas 2006, no pet.). The failure to provide appropriate record citations or a substantive analysis waives an appellate issue. *WorldPeace v. Comm'n for Lawyer Discipline*, 183 S.W.3d 451, 460 (Tex. App.–Houston [14th Dist.] 2005, pet. denied) (holding that failure to offer argument, citations to record, or citations to authority waives issue on appeal); *Med. Specialist Grp., P.A. v. Radiology Assocs., L.L.P.*, 171 S.W.3d 727, 732 (Tex. App.–Corpus Christi 2005, pet. denied) (same); *see also Fredonia State Bank v. Gen. Am. Life Ins. Co.*, 881 S.W.2d 279, 284–85 (Tex. 1994) (holding appellate court has discretion to deem issues waived due to inadequate briefing). References to sweeping statements of general law are rarely appropriate. *Bolling v. Farmers Branch Ind. Sch. Dist.*, 315 S.W.3d 893, 896 (Tex. App.–Dallas 2010, no pet.). Appellate courts must construe briefing requirements reasonably and liberally, but a party asserting error on appeal still must put forth some specific argument and analysis showing that the record and the law support its contentions. *San Saba Energy, L.P. v. Crawford*, 171 S.W.3d 323, 338 (Tex. App.–Houston [14th Dist.] 2005, no pet.).

An appellate court has no duty—or even right—to perform an independent review of the record and applicable law to determine whether there was error. *Valadez v. Avitia*, 238 S.W.3d 843, 845 (Tex. App.–El Paso 2007, no pet.). Were we to do so, we would be abandoning our role as neutral adjudicators and become an advocate for that party. *Id.* Here, J.W. presented no

---

[2] Because we have concluded that the evidence is legally and factually sufficient to support termination of J.W.'s parental rights under subsection (b)(1)(E), we need not address her first or second issues regarding subsections (b)(1)(D) and (b)(1)(O) of Section 161.001(b)(1), or her fourth issue regarding Section 161.003. *See* TEX. FAM. CODE ANN. § 161.001(b)(1); TEX. R. APP. P. 47.1.

12

argument regarding her fifth issue, merely a statement in the "issues presented" section of her brief. She does not provide any citations to the record, any substantive legal analysis, or any citations to authority in support of this complaint. J.W. does not refer to, or provide any, legal authority or analysis to support this claim, specifically regarding whether there is clear and convincing evidence that termination of her parental rights is in the best interest of the children. *See Sweed v. City of El Paso*, 195 S.W.3d 784, 786 (Tex. App.–El Paso 2006, no pet.) (stating that "merely uttering brief conclusory statements" is not a discussion of the facts and authorities relied upon contemplated by Rule 38). In the absence of any legal analysis, citations to the record, and citations to appropriate authorities, J.W. presents nothing for our review regarding her fifth issue. *See WorldPeace*, 183 S.W.3d at 460; *Med. Specialist Grp.*, 171 S.W.3d at 732. Accordingly, we overrule J.W.'s fifth issue.

## DISPOSITION

Having overruled J.W.'s third and fifth issues, we *affirm* the trial court's judgment.

GREG NEELEY
Justice

Opinion delivered March 7, 2018.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

(PUBLISH)

13



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**MARCH 7, 2018**

**NO. 12-17-00306-CV**

**IN THE INTEREST OF B.W. AND C. W., CHILDREN**

Appeal from the 173rd District Court

of Henderson County, Texas (Tr.Ct.No. FAM16-0667-173)

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, and that this decision be certified to the court below for observance.

Greg Neeley, Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*